G. L. HUEY v. THE STATE.

No. 21623. Delivered May 28, 1941.
On Rehearing October 8, 1941.
On Delayed Motion for Rehearing October 29, 1941.

The opinion states the case.

*J. Y. Gray* and *Alex P. Pope,* both of Tyler, for appellant.

*Spurgeon E. Bell,* State's Attorney, of Austin, for the State.

KRUEGER, Judge.

The offense is murder. The punishment assessed is confinement in the State penitentiary for a term of four years.

The statement of facts accompanying the record does not appear to have been approved by the judge who tried the case. Without his approval thereof we are precluded from considering the statement of facts. See authorities cited in Note 24 under Art. 760, Vernon's Ann. Tex. C. C. P., Vol. 3, pp. 103-107; 4 Tex. Jur., p. 419, sec. 287; Branch's Ann. Tex. P. C., sec. 596. In the absence of a statement of facts, we cannot properly appraise the bills of exception found in the transcript.

The judgment of the trial court is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

KRUEGER, Judge.

On a former day of the preceding term of this court we affirmed the judgment because the statement of facts did not appear to have been approved by the court and therefore could not be considered. In the absence of the facts we could not properly appraise the bills of exception. Since then it has been shown that the trial court did actually approve the statement of facts but inadvertently failed to sign it. Hence, on the motion for rehearing we will consider it and dispose of the case on its merits.

Appellant and the deceased were cousins. Each had a family and lived within 150 yards of each other. The deceased and his

family were the victims of abject poverty while appellant owned a small farm, a team and some farming implements. Some months prior to the time of the unfortunate occurrence, the deceased and appellant entered into an agreement under and by virtue of which the deceased became a share cropper with the right to use appellant's team and farming implements. The deceased owned a pig, and some kind person had loaned him a milk cow. These animals at times wandered onto the appellant's premises. On the night next preceding the morning of the killing the pig escaped from the pen. A son of the deceased tracked it to the appellant's lot and tried to catch it when he (appellant) appeared and told the boy that they would have to keep the pig up as he did not want it to depredate upon his berry patch any more and that they also had to keep the cow out of the crop. In the meantime, an older son of the deceased had come to the appellant's lot and was putting the harness on the team to do some plowing when an argument arose between the boys and appellant which almost precipitated a fight. At this time the deceased appeared on the scene with a stick or wagon spoke, and some unpleasant remarks were passed between him and appellant. The appellant went from the lot into his home while deceased and his son (who had the pig on a rope) were endeavoring to drive it home and in so doing passed through appellant's yard and near his home. Appellant, who had entered his home from the rear, suddenly appeared on his front porch and when the deceased came along beside the house, he shot him with a shotgun, inflicting wounds from which death resulted a few days later.

Appellant's version of the occurrence at the time of and immediately preceding the killing differs in some material respects from that of the State. With reference to what occurred out at the lot, he testified to some threats that were made against him; that the deceased followed him from the lot to his home with a wagon spoke in his hand; that after he (appellant) entered his home, he picked up his shotgun, walked out on his porch, and when the deceased saw him he (deceased) drew back with the stick in an attitude of striking or throwing it at him which caused him to shoot in self-defense.

Appellant filed a plea for a suspension of sentence in the event of his conviction.

Bill of Exception No. 1 complains of the testimony of Dr. Cupp who treated the deceased for the wounds and made an

X-ray picture of the body of the injured man. The doctor testified that the shot ranged downward at an angle of about twenty degrees. Appellant objected to said testimony on the ground that it was a question for the jury to determine as to what degree the shot ranged and was not the subject of expert testimony. We are not in accord with appellant's contention. The doctor not only had examined the wounded man but had made an X-ray picture of the wounds and found that the deadly missiles had ranged downward, which testimony was clearly admissible. The additional fact that the pellets ranged at an angle of about twenty degrees was but an approximation of the course or slant of the deadly missiles as they entered the body. Moreover, it seems that on this subject there was no issue taken by the defendant. He admitted that he was standing on his front porch while the deceased was on the ground when the shot was fired. Consequently it was not material whether the shot ranged downward at an angle of 10, 20 or 30 degrees.

Bill of Exception No. 2 reflects the following occurrence: Appellant placed his wife on the witness-stand, who testified to some serious threats that had been made by the deceased against her husband prior to, as well as on the day of the killing; that on the morning of the homicide the deceased came to the lot of the appellant with a stick or wagon spoke; that he and appellant had some words about the cow and the pig running in the crop and berry patch; that when appellant left the lot and started to the house the deceased followed him with the stick in his hand; that appellant went into the house and the deceased, with the stick in his hand, went around the house toward the front of it. On cross-examination the District Attorney asked her the following question: "The boy (meaning deceased's son) had some trouble getting the pig, didn't he?" She replied: "I think so; he was up at the house." Appellant objected to the question and answer on the ground that it was requiring the wife to testify against her husband inasmuch as said matter had not been developed or elicited by appellant on her examination in chief. We are of the opinion that the inquiry was germane to the facts elicited from her by appellant on her direct-examination. She testified that appellant and deceased had some words about the pig and cow being in the crop and berry patch; that the deceased came to the lot with a stick in his hand and followed appellant with it from the lot to the house which, no doubt, was intended to impress the jury with the idea that the deceased's acts and conduct showed a hostile and aggressive attitude. Consequently, the State had a right to show by her,

if it could, that his purpose in carrying the stick was to punch the pig along and assist his son in trying to take it home and not as a means of offense, which her testimony implied. Hence the inquiry which tended to show the contrary was permissible. We are of the opinion that what we have said here finds support in the case of Burdett v. State, 32 S. W. (2d) 360. See also Vernon's Ann. C. C. P., Vol. 2, p. 766.

Bill of Exception No. 3 shows that appellant placed his wife on the witness-stand and after having testified on direct examination in his behalf, she was cross-examined by the District Attorney who, in the course of the examination, asked her the following questions and received the following answers:

"Q. Whatever his position was with reference to his being in front or back of the pig, he was using that stick for punching the pig? A. Don't think he used it to punch the pig; he brought the stick along as he always did.

"Q. You don't know of anything he was doing when he was shot? A. No, sir; I didn't see him.

"Q. On the morning of the shooting of Mr. Fleming you saw Mr. T. Hicks; did he come to your home? Is it not a fact that he asked you what Lum (meaning deceased) was doing at the time he was shot and you told him he was punching the pig along? A. No, I did not tell him that."

The State then called Mr. T. Hicks, who testified that he was constable of that precinct; that he had a conversation with appellant's wife on the morning of the killing in which she stated that the deceased, at the time he was shot, was punching the pig along. To which appellant objected on the ground that it was compelling the wife of the defendant to testify against him, which objection was overruled and appellant excepted. The trial court qualified this bill and in his qualification states that he had the jury retired when appellant objected to any statement she may have made to the county attorney some hours after the killing, and in the absence of the jury heard testimony relative to such statement and then sustained appellant's objection. However, the court permitted the State to prove that the witness told the constable at her home very soon after the killing that the deceased was punching the pig along with the stick at the time of the killing. We think that the cross-examination of the witness was germane to the testimony given by her on direct examination and that

she was subject to impeachment the same as any other witness by showing that she had made a voluntary statement out of court contradictory of her testimony given at the trial. She testified that the deceased followed appellant from the lot to the house with a stick in his hand; that both were walking pretty fast; that the deceased did not follow appellant into the house but went around to the side thereof. Her testimony left the impression that the deceased was following her husband with a stick as a means of offense. Hence, her statement to the constable immediately after the killing to the effect that the deceased was using the stick to punch the pig along was pertinent and germane to her testimony in chief. See Hicks v. State, 75 Tex. Cr. R. 461; Reagan v. State, 70 Tex. Cr. R. 498; Young v. State, 54 Tex. Cr. R. 417; Dobbs v. State, 54 Tex. Cr. R. 550; Swanney v. State, 66 Tex. Cr. R. 293, and cases there cited. See also Glover v. State, 152 S. W. (2d) 747.

Bill of Exception No. 4 is qualified by the court. The qualification shows that after appellant objected to the court's charge on the ground that it shifted the burden of proof to the defendant, he amended his charge and no further objection on the point was made. The qualification also shows that the court gave appellant's requested charge No. 2 and limited the impeaching testimony of T. Hicks to such purpose only. As thus qualified the bill fails to reflect reversible error.

Appellant addressed a number of objections to the court's charge. We have examined the charge, together with appellant's requested charge which the court submitted to the jury, and reached the conclusion that it adequately presented the law of the case.

No reversible error appearing in the record, the judgment is affirmed.

ON DELAYED MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

The judgment of conviction was affirmed on October 8th. The fifteen days within which motion for rehearing might have been filed expired on October 23d. The mandate issued on October 24th. On October 25th a motion for rehearing was mailed to the Clerk of this court, which was not received in due course of mail until October 27th. It was placed in the mail too late.

However, if the motion had been filed in time, it contains nothing to demand the attention of the court. It seeks a re-hearing on the ground only that "the original opinion rendered in this cause is contrary to the law and evidence in this case." Such a statement is too general to present anything for consideration.

The motion having been placed in the mail too late, the Clerk is directed to lodge it with the papers of the case, and not to place a file mark thereon.

The delayed motion for rehearing will not be considered.